William **TIMPINARO**, et al., Petitioners,

v.

**SECURITIES AND EXCHANGE COMMISSION**, Respondent.

Nos. 91–1502, 91–1650.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1992.

Decided Aug. 13, 1993.

As Amended Aug. 24, 1993.

As Amended on Denial of Rehearing Nov. 9, 1993.

Barry S. Augenbraun, New York City, argued the cause, for petitioners. With him on the briefs were W. Reece Bader and Simon S. Kogan, New York City.

Joan A. McCarthy, Sr. Special Counsel, S.E.C., Washington, DC, argued the cause, for respondent. With her on the briefs were Paul Gonson, Sol., James R. Doty, Gen. Counsel, Anne E. Chafer, Associate Gen. Counsel, and David U. Thomas, Sr. Counsel, S.E.C., Washington, DC.

Before WALD, D.H. GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Several securities broker-dealers and their customers petition for review of three orders that the Securities Exchange Commission issued on October 10, 1991 pursuant to § 19(b) of the Securities Exchange Act of 1934, as amended. Two of the orders approved new rules for the Small Order Execution System (SOES), an automated system developed by the National Association of Securities Dealers (NASD), Inc., the self-regulatory organization for the over-the-counter securities market: The Professional Trader Rule defines "professional traders" and bars them from using the SOES, *see* Exch. Act. Rel. No. 29809 (Oct. 10, 1991), 56 *Fed.Reg.* 52092 (Oct. 17, 1991), while the 15–Second Rule provides for a grace period in which a market maker may update its price quotations between trades over the SOES. *See* Exch. Act. Rel. No. 29810 (Oct. 10, 1991), 56 *Fed. Reg.* 52098 (Oct. 17, 1991). The third order denies a petition for rulemaking to lift all restrictions on SOES trading. We deny the petitions for review with respect to both the 15–Second Rule and the SEC's denial of the petition for rulemaking, and remand the Professional Trader Rule for further explanation.

## I. BACKGROUND

The NASD developed the SOES in 1984 in order to allow automatic execution of small trades at prices advertised on the National Association of Securities Dealers Automated Quotation System (NASDAQ). *See* 56 *Fed. Reg.* 52092 (Oct. 17, 1991) ("SOES was designed to provide the benefits of automatic execution to retail customer orders of limited size for securities quoted on the [NASDAQ] System"). Using the SOES, a broker-dealer can instantly execute a trade for a customer at the "inside market"—the best bid or ask price offered by any firm making a market in the relevant security. Because the order is executed on the NASDAQ computer, the OTC market maker whose offer is accepted does not know about the SOES trade until just after it has been executed.

In June 1988 the NASD began requiring that each market maker automatically execute at its quoted price orders aggregating five times the maximum order size (200, 500, or 1,000 shares, depending upon the security) for every security in which it makes a market. It soon emerged, however, that an attentive trader using the SOES could exploit even a momentary disparity among the prices being offered by the firms making a market in a particular security; traders would closely track movements in the price of a volatile stock and, if one market maker was the least bit behindhand in repricing the stock, lock in an arbitrage profit at no risk. The traders would also monitor news developments constantly and use the instantaneous execution feature of the SOES to purchase shares before the market makers—who frequently handle many stocks—could adjust their quotations to reflect the new information. By executing within a few seconds as many as five orders for up to 1,000 shares each and liquidating the position shortly afterward at the new market price, a trader could profit handsomely at the expense of the market maker.

In December 1988 the NASD tried to prevent these traders from using the instant execution feature of the SOES to profit from disparities in the prices quoted by various market makers. This it did by barring broker-dealers from using the SOES on behalf of "professional trading accounts." A professional trading account is defined as any account in which either five or more "day trades" (*i.e.*, offsetting purchases and sales of the same security on the same day) are executed through the SOES on any single trading day, or in which the NASD Market Surveillance Department detects a "professional trading pattern" using the SOES.

The prohibited pattern was to be discerned on the basis of three factors: (1) a pattern or practice of day trading; (2) a high volume of day trades in relation to all trading in the account; and (3) a high volume of day trades in relation to the number and value of securities held in the account.

Notwithstanding this regulatory approach, the NASD found that some traders were still able to exploit price disparities "while carefully evading the definition of a professional trading account." 56 *Fed.Reg.* 52092, 52096 (Oct. 17, 1991). Consequently, in 1990 and 1991 the NASD filed with the SEC proposed rules designed further to restrict access to the SOES; the Commission approved these rule changes in October 1991.

As amended, the Professional Trader Rule expands the definition of a "professional trading account" by including day trades in which only one side of the transaction is executed through the SOES and by adding four more factors to be considered in determining whether an account is a professional trading account: (1) excessive frequency of short-term trading; (2) excessive frequency of short sale transactions; (3) broker-dealer discretionary authority over the account; and (4) direct or physical access to the SOES execution capability, to NASDAQ level 2 quotation information, or to the National Quotation Data Service. *See* Exch. Act Rel. No. 29809 (Oct. 10, 1991), 56 *Fed.Reg.* 52092 (Oct. 17, 1991). The 15–Second Rule provides market makers with a grace period, after executing a trade on the SOES, in which to update their quotations before they must stand ready to execute another SOES transaction on the same side (i.e., as buyer or seller) of the same security. *See* Exch. Act Rel. No. 29810 (Oct. 10, 1991), 56 *Fed.Reg.* 52098 (Oct. 17, 1991). A market maker may, however, waive the 15–Second Rule pursuant to a "preferencing agreement" with a particular broker-dealer, which may then execute multiple trades on the SOES without any delay between them.

Meanwhile, in August 1991 the petitioners had asked the SEC for a rulemaking to eliminate all restrictions on use of the SOES. The Commission denied their petition for rulemaking at the same time and for the same reasons that it approved the tighter restrictions outlined above. The SEC took the position that, if access to the SOES were unrestricted, then market makers would reduce the number of securities in which they make a market so that they could monitor and update their quotations more quickly, the better to eliminate arbitrage opportunities.

## II. ANALYSIS

Under the '34 Act, the SEC may approve a proposed change in the NASD's rules only if it finds that the change is "consistent with the requirements of [the Act]." 15 U.S.C. § 78s(c). Section 15A(b)(6) provides that NASD rules must, among other things, remove impediments to a free and open market and a national market system, and protect investors and the public interest. 15 U.S.C. § 78o–3(b)(6). The rules may not permit any unfair discrimination among customers, issuers, or dealers, *id.* nor impose any burden upon competition that is not necessary or appropriate in furtherance of the purposes of the Act. § 15A(b)(9) of the Act, 15 U.S.C. § 78o–3(b)(9).

### A. 15–Second Rule

■ We are concerned here with only one aspect of the 15–Second Rule, *viz.* the exemption for "preferenced" firms. The petitioners do not object to the 15–second grace period before a market maker must accept a second SOES trade, perhaps because the Firm Quote Rule, 17 CFR 240.11Ac1–1(c)(2), already provides for a similar grace period after executing a telephonic order. Exch. Act Rel. No. 14415, 43 *Fed.Reg.* 4344 (Feb. 1, 1978). The 15–Second Rule merely extends that provision into the realm of automated executions.

The petitioners challenge the exemption for "preferenced" broker-dealers on the ground that it "discriminates between those who have a 'preferencing agreement' and all others." The '34 Act, however, prohibits "unfair discrimination," not "discrimination" *simpliciter,* 15 U.S.C. § 78o–3(b)(6), and the petitioners have not shown that it is in any way unfair for a market maker to waive the

protection of the 15–second grace period. As we have seen, the grace period is designed to protect the market maker from having to make an involuntary second trade at an untimely inside quotation. Under a "preferencing" arrangement the broker-dealer presumably agrees not to take advantage of the market maker when it is showing an untimely inside quotation, in return for which the market maker waives the grace period. It would be peculiar indeed to force upon the market maker and its customer the broker-dealer, both investment professionals, a grace period that neither party wants.

■ Moreover, as the Commission noted, "[m]any broker-dealers have order routing arrangements ... under which they agree in advance to send their order flow to a specific [market maker]." By waiving the grace period, a market maker can give a broker-dealer immediate execution in exchange for a higher volume of the broker-dealer's trading business. In effect, the market maker is giving a non-price volume discount in the form of immediate execution. Non-price discounts are an everyday feature of business; not only is there nothing inherently "unfair" about them, they have the same pro-competitive effect as a price discount. *See Competitive Telecommunications Assn. v. FCC*, 998 F.2d 1058, 1062 (D.C.Cir.1993) (extra telecommunications service at no cost is "functional equivalent of a price discount"); Douglas H. Ginsburg, *Non–Price Competition*, 38 ANTI-TRUST BULL. 83 (1993) (non-price discounting is pervasive business practice that should be considered in antitrust analysis).

■ In the alternative, the petitioners ask that we remand this matter for the SEC to provide the public with an opportunity to comment on the preferenced firm exception to the 15–Second Rule. The notice of proposed rulemaking given by the SEC dealt only with the 15–second grace period, not the exception the agency engrafted onto the final rule. *See* Exch. Act Rel. No. 29182 (May 9, 1991), 56 *Fed.Reg.* 22496 (May 15, 1991). Further notice before adopting the exception was not necessary, however, because the final rule was "a 'logical outgrowth' of the rulemaking proceeding" for which notice was given. *American Federation of Labor v.*

*Donovan,* 757 F.2d 330, 338 (D.C.Cir.1985) (quoting *United Steelworkers v. Marshall,* 647 F.2d 1189, 1221 (D.C.Cir.1980)).

The proposed and final rules were both directed at the same conduct of the same parties—use of the instant execution feature of the SOES by active investors in order to buy from or sell to market makers at untimely inside quotations. The proposed and final rules differ only insofar as the unheralded exception allows a market maker to waive the protection of the grace period when it is dealing with a broker-dealer that will not give it need for that protection. Thus, the preferencing exception amounts to a garden-variety right to waive the legal protection of the general rule. That a firm for whose benefit a rule exists may waive the rule is the norm in economic regulation. *See, e.g.,* U.C.C. § 2–316 (contract party may waive protection of warranty of merchantability implied per § 2–314). The SEC's addition of an express provision to that effect is at least a "logical outgrowth" of the proposed rule, if not an explicit recognition of what was already an implicit corollary. Hence, the SEC was not required to give the public a second opportunity to comment before adopting the exception.

## B. *Professional Trader Rule*

■ The SEC explained its reason for adopting the Professional Trader Rule as follows: "[I]f professional traders are not restrained from using SOES, there is a reasonable likelihood that more market makers will cease making markets, spreads will widen and liquidity will be negatively impacted." 56 *Fed.Reg.* 52092, 52096 (Oct. 17, 1991). The Commission proceeds from a sound theory of market behavior.

It is reasonable to assume that a trader will exploit a price disparity among different market makers in order to lock in an arbitrage profit if that profit exceeds the trader's transaction costs. (Indeed, it is undisputed that some nimble traders in fact use the SOES in order to execute instantaneous trades that take advantage of brief price discrepancies.) A market maker will presumably respond to getting "picked off" in this fashion by monitoring the market more

closely and thus updating its quotations more quickly—a gain in market pricing efficiency. If that were all, then so-called "professional trading" on the SOES would seem to be an unalloyed benefit. Not surprisingly, however, the benefit comes at a cost, *viz.* the cost the market maker incurs for additional vigilance. The market maker will try to recover that cost in the only way it can, by increasing the spread between the prices at which it will buy or sell a security, which raises the cost of trading and therefore tends to diminish market liquidity. To the extent that market makers cannot recover their costs in this way, moreover, fewer firms will make a market in some securities—which makes for less efficient pricing in the market. Which tendency predominates, the gain or the loss of efficiency in market pricing?

Suggesting that the gain predominates because there is no loss, the petitioners point out that the record contains no empirical data showing that active SOES trading led market makers, before the new Rules were implemented, either to withdraw from dealing in some securities or to increase their spreads. The Commission argues that only the NASD's assurances of imminent regulatory relief prompted market makers to defer "taking significant responsive action on their own." Exch. Act. Rel. No. 32092 (Apr. 1, 1993), at 23. At best, however, the SEC's rationale can explain only the Commission's failure to produce data showing that market makers withdrew from making a market in SOES-traded securities. The SEC offers no reason to think that the prospect of regulatory relief would cause a market maker to absorb rather than to pass on its higher costs in the form of a larger bid-ask spread. On the contrary, as the SEC itself has noted, "[t]o the extent they can pass on their costs, market makers will raise prices [*i.e.*, widen spreads] on all NASDAQ trades to compensate for the costs attributable to professional trading." Exch. Act. Rel. No. 32092 (Apr. 1, 1993), at 2.

The SEC should have determined how much bid-ask spreads widened as a result of "professional SOES trading," and whether that increase was large enough—in conjunction with the possibility that market makers would withdraw from some securities—to outweigh the benefit of more timely price changes that the Rule confers. In this vein, we note that the NASD recently issued a study using regression analysis to relate the proportion of trading in a security that is done by "SOES active trading" firms to the spreads quoted by firms making a market in that security. *See* NASD Department of Economic Research, Impact of SOES Active Trading Firms on Nasdaq Market Quality (May 12, 1993). We cannot say whether such a study could or should have been conducted before the Professional Trader Rule was adopted, but the apparent feasibility of such a study reinforces our conviction that the SEC has not adequately substantiated its implicit claim that the effect of "professional SOES trading" upon bid-ask spreads outweighs the beneficial effect of more timely pricing by market makers. We therefore remand this aspect of the case for the Commission to address the balance of benefits and costs associated with the Professional Trader Rule.

In order to justify the Professional Trader Rule as a way of protecting market makers from getting "picked off" by professional traders, the SEC also needs to explain why a trader who cannot use the SOES would not just switch to placing telephonic orders to "pick off" the market makers. Under the Firm Quote Rule, the market maker must execute any telephonic order to buy or sell a security at its posted price (including an untimely inside price) "in any amount up to [its] published quotation size." 17 CFR 240.-11Ac1–1(c)(2). Upon receiving the first telephonic order, the market maker would be on notice that its quotation was untimely and would presumably update it promptly. The key question, then, is whether the volume limits of the Firm Quote Rule are higher or lower than the volume limits on SOES trading. If a market maker's exposure under the Firm Quote Rule is greater than its exposure under the SOES, then the profit-maximizing "professional trader" would presumably buy or sell over the telephone even if his access to the SOES were not restricted. According to the petitioners, however, "professional traders" must use the SOES because market makers routinely refuse to honor their quot-

ed prices, in violation of the Firm Quote Rule. If the beneficial effect of the Professional Trader Rule is contingent upon market makers' noncompliance with the Firm Quote Rule, then the Professional Trader Rule is surely arbitrary and capricious.

After the oral argument in this case, the court ordered the SEC to supplement the record so as to address the question how the proposed rules would protect SOES market makers from being "picked off" if those market makers are in fact complying with the Firm Quote Rule. In its supplementation the SEC intimates in two places that a market maker faces greater exposure under the SOES than under the Firm Quote Rule. *See* Exch. Act. Rel. No. 32092 (Apr. 1, 1993), at 11 ("The 1991 SOES orders protect market makers from being 'picked off' by rapid-fire multiple executions for larger trades than are contemplated by the Firm Quote Rule and without the opportunity, provided by the exceptions to the Firm Quote Rule, to update quotations"); *id.* at 15 ("market makers ... are subject to rapid-fire executions that exceed their quote size without the ability to update their quotes"). Even if that is the case, and assuming *arguendo* that market makers are honoring their obligations under the Firm Quote Rule, then the benefit of the Professional Trader Rule is only that it forces "professional traders" to place their orders by telephone and thereby lessens but does not eliminate the market makers' exposure to being "picked off."

We still have no clear idea, however, whether SOES trades do in fact exceed the Firm Quote Rule volume limit with any frequency. Indeed, because the SEC itself has stated that "non-SOES related trades ... generally exceed the SOES transaction size of 1000 shares," it appears quite possible that an automated trade only rarely exceeds the quotation size for a telephonic order. In that case the costs might well exceed the benefits of the Rule—at least in the broad form it now takes.

In any event, we can find no evidence in the record—not even in the comments submitted by market makers—to support the contention that SOES trades regularly exceed the volume ceilings for telephonic or-

ders. Yet it would hardly seem a difficult matter for the SEC to have compiled data showing the degree, if any, to which market makers are subject to SOES trading in excess of their stated volume limits under the Firm Quote Rule. Two conclusory and unsupported remarks in the record as supplemented at our request simply do not amount to substantial evidence.

The two passages in the supplemented record do suggest, however, that on remand the SEC may be able to provide factual support for the Rule. We therefore remand the Rule without vacating it, for the SEC to demonstrate that SOES trading exceeds the volume limits market makers specify under the Firm Quote Rule often enough to warrant the protection of the Professional Trader Rule.

■ Because we are leaving the Professional Trader Rule in place despite the need for further agency proceedings on remand, we reach the petitioners' alternative argument that the Rule violates § 15A of the Securities Act and the Due Process Clause of the United States Constitution by failing to provide a trader with notice and an opportunity to be heard before he is designated a "professional trader" and as such barred from using the SOES. Section 15A(h)(2) requires the NASD to "notify" anyone denied access to a service it offers and to "give him an opportunity to be heard upon, the specific grounds for denial, bar, or prohibition under consideration and keep a record." 15 U.S.C. § 78o–3(h)(2). Section 15A(h)(3), however, permits the NASD summarily to limit access to a service, provided that the aggrieved party thereafter "be promptly afforded an opportunity for a hearing." The Professional Trader Rule in turn provides that a trader barred from the SOES has the right to a post-designation hearing. Therefore, we reject the petitioners' claim that the Professional Trader Rule violates the Securities Act.

Nor does the lack of a pre-deprivation notice and hearing render the Rule unconstitutional. To determine what process is due, we must balance the strength of the private interest affected by suspension from SOES trading, the risk of mistaken deprivation under current procedures and the likely value

of additional safeguards, and the Government's interest in avoiding additional procedures. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Petitioners do not even attempt to explain why a post-deprivation hearing entails a greater risk of erroneous deprivation than a pre-deprivation hearing. *See Reeve Aleutian Airways v. United States,* 982 F.2d 594 (D.C.Cir.1993) (post-deprivation procedures used by Commercial Airline Review Board in suspending airline do not violate due process although airline has significant reputational and economic interest in avoiding suspension); *accord Hodel v. Virginia Surface Mining and Reclamation Assn., Inc.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979).

■ The petitioners also argue that the definition of a professional trading account, as amended by the Professional Trader Rule, is unconstitutionally vague. A vague rule "denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions." *Hastings v. Judicial Conferences of the United States,* 829 F.2d 91, 105 (D.C.Cir. 1987); *see also Broadrick v. Oklahoma,* 413 U.S. 601, 607, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973) (statute is unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning") (quotation marks and citation omitted). At the same time, "economic regulation is subject to a less strict vagueness test ... because businesses ... can be expected to consult relevant legislation in advance of action." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). It does seem, however, that even after consulting the relevant statutes and regulation, a trader would be hard pressed to know when he is in danger of triggering an adverse reaction from the NASD.

Fully five of the seven factors to which a trader must attend if he is to avoid engaging in a "professional trading pattern" are subject to seemingly open-ended interpretation. We refer to (1) a pattern or practice of day trading; (2) a high volume of day trades in

relation to all trades in the account; (3) a high volume of day trades in relation to the number and value of securities held in the account; (4) excessive frequency of short-term trading; and (5) excessive frequency of short sale transactions. What makes a frequency "excessive," for example, is a mystery so far as the current record is concerned. The uncertainty facing a trader who wants to avoid sanction is all the greater when these mysteries are considered in combination, according to some undisclosed system of relative weights. Yet the SEC Order adopting the Rule manifests no concern about its possible vagueness, and the agency did not deign to address the petitioners' void for vagueness argument in its brief to this court.

Of course, it is quite possible that the Commission has used the most precise terms possible, consistent with its regulatory goals. But it is also quite possible that the agency could provide traders with greater guidance, perhaps by specifying some numerical thresholds, below which a trader would find a harbor safe from regulatory squalls or above which he should surely expect to encounter rough sailing. *See, e.g.,* Department of Justice and Federal Trade Commission, 1992 Horizontal Merger Guidelines, 57 *Fed.Reg.* 41552 (Sept. 10, 1992). In any event, on remand the SEC should (re)consider the vagueness issue and respond to the petitioners' challenge.

In conclusion, we remand the Professional Trader Rule for the SEC to (1) explain the relationship between a market maker's volume limits under the Firm Quote Rule and its exposure through SOES trading; (2) explain or cure its failure to produce data measuring the effect of active SOES trading on bid-ask spreads; (3) balance the costs and benefits of the Professional Trader Rule; and (4) consider whether the seven-part test for determining a "professional trading pattern" could be made more definite before it is subjected to scrutiny under the Due Process Clause.

### C. Denial of Petition for Rulemaking

■ The petitioners argue that the SEC should have granted their petition to institute a rulemaking that would rescind all restric-

tions upon traders' access to the SOES. "We apply an extremely deferential standard of review to an agency's refusal to institute rulemaking proceedings" and "will grant the petition for review 'only in the rarest and most compelling of circumstances.'" *Consumer Fed'n of America v. Consumer Product Safety Comm'n,* 883 F.2d 1073, 1078 (D.C.Cir.1989) (quoting *WWHT, Inc. v. FCC,* 656 F.2d 807, 818 (D.C.Cir.1981)). "Compelling circumstances 'primarily involve plain errors of law, suggesting that the agency has been blind to the source of its delegated power.'" *Consumer Fed'n of America,* 883 F.2d at 1078 (quoting *State Farm Mut. Auto. Ins. Co. v. Dep't of Transportation,* 680 F.2d 206, 221 (D.C.Cir.1982), *vacated on other grounds sub nom. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

■ The Commission denied the petition to rescind the Rules for the same reasons that it approved the Rules. *See* Letter from Jonathan Katz, Secretary, Securities and Exchange Commission, to Sam Scott Miller, Esq., Oct. 10, 1991, at 3. And as stated above, the 15–Second Rule is a reasonable restriction on SOES trading, and the Professional Trader Rule is premised upon a credible economic theory, even if the Commission has at this juncture failed in some respects to explain its basis. Therefore, the SEC's denial of the petition to rescind its regulations of the SOES is a far cry from "that rare and compelling case that would justify our overturning the Commission's refusal to initiate rulemaking." *Consumer Fed'n of America,* 883 F.2d at 1079.

### III.  CONCLUSION

For the foregoing reasons, the petition for review is denied with regard to the 15–Second Rule and the petition for rulemaking. We remand the record in this case for the SEC to provide further explanations of the Professional Trader Rule and to address the petitioners' vagueness challenge, as set out in Part II.B. above. Pursuant to Circuit Rule 15(c), the court will retain jurisdiction of this matter.

*So ordered.*