Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued October 21, 2003      Decided February 20, 2004

No. 02-1257

WILLISTON BASIN INTERSTATE PIPELINE COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TENNESSEE GAS PIPELINE COMPANY, ET AL.,
INTERVENORS

————

On Petition for Review of Orders of the Federal
Energy Regulatory Commission

————

*Robert T. Hall III* argued the cause for petitioner. With him on the brief was *John R. Schaefgen, Jr.*

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Howard L. Nelson* argued the cause and filed the brief for intervenor Tennessee Gas Pipeline Company.

Before: GINSBURG, *Chief Judge*, and EDWARDS, *Circuit Judge,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Williston Basin Interstate Pipeline Company petitions for review of two orders in which the Federal Energy Regulatory Commission, proceeding under § 5 of the Natural Gas Act (NGA), held Williston's practice of selective discounting was discriminatory, unjust, and unreasonable. The Commission directed Williston to adopt instead the discounting policy set forth in previous Commission orders issued to other pipelines. Because the Commission failed to provide an adequate explanation for its ruling, we grant Williston's petition and vacate the orders under review.

## I. Background

As a result of the FERC's restructuring of the natural gas industry, pipelines now have significant flexibility in setting the rates they charge shippers. *See generally Associated Gas Distribs. v. FERC*, 824 F.2d 981 (D.C. Cir. 1987); *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, Order No. 436, FERC Stats. & Regs. [Regs. Preambles 1982–85] (CCH) ¶ 30,665 (1985). This flexibility is seen in the Commission's approval of "selective discounting," which allows a pipeline to charge different rates to different shippers provided certain conditions are met. Selective discounting can benefit not only the favored shipper(s) but also shippers that do not receive discounts because, by inducing increased throughput, it may enable the carrier to spread its fixed costs across a greater number of units shipped on its system. *See Interstate Natural Gas Pipeline Rate Design*, 47 FERC ¶ 61,295, at 62,053 (1989).

The Commission has also given shippers greater flexibility in the shipment of gas across a pipeline system. For in-

stance, where operationally feasible a shipper may "segment" its firm capacity "into separate parts for its own use or for the purpose of releasing capacity to ... replacement shippers." *See Colorado Interstate Gas Co.* (*CIG*), 95 FERC ¶ 61,321, at 62,120 (2001) (discussing requirements Commission set out in Order No. 637, *Regulation of Short–Term Natural Gas Transportation Services and Regulation of Interstate Natural Gas Transportation Services*, FERC Stats. & Regs. [Reg. Preambles 1996–2000] (CCH) ¶ 31,091 (2000)). The Commission also has adopted "flexible point rights," which allow "firm shippers ... to change receipt and delivery points (secondary points) so they can receive and deliver gas to any point within the firm capacity rights for which they pay." *Id.*

In *CIG* the Commission adjusted its policy on selective discounting to resolve the perceived "tension between the Commission's current discount policy, which permits pipelines to restrict discounts to specific shippers at specific points, and the Commission's goal in adopting its segmentation and flexible point right policies of enhancing competition." *Id.* The Commission newly permitted a shipper to pay the higher of the discounted rate it received when shipping from its primary to a secondary delivery point or the discounted rate offered to other "similarly situated" shippers at the secondary point. The Commission provided the following example to explain the issue:

> Shipper A has a contract for 100 [dekatherms/day] from point A to B at a discounted rate of $0.50, and the pipeline has restricted the discount to Point B, so that the shipper would be required to pay the maximum tariff rate if it changes points. The maximum rate in the zone is $1.00. Shipper A segments its capacity at Point C or moves to Point C on a secondary basis, which is within its capacity path. The pipeline has contracts at point C for $0.75. The issue is what rate should Shipper A pay for the transaction at C: (1) the maximum rate of $1.00 because the shipper is not using the original points in the discount contract; (2) the $0.50 discounted rate because

the shipper is using points within its capacity path; or (3) the rate charged for pipeline transportation service to other customers at Point C of $0.75.

*Id*. at 62,120–21. Under the approach adopted by the Commission in *CIG* and applied to Williston here, Shipper A's discounted rate at Point C would be $0.75—the higher of options (2) and (3) in the example.

The Commission also expressed the concern, however, that the pipeline "may not have the same incentive" to offer discounts at secondary points where a shipper competes directly with the pipeline's sale of primary capacity at that point because, without the discount, the pipeline's sale of primary capacity would command the maximum rate. *Id.* at 62,121. It therefore adopted a "rebuttable presumption" that a shipper should receive a discount at a secondary point if the pipeline is already granting a discount at that point "under other firm or interruptible service agreements," *id.*; the pipeline may "rebut the presumption by demonstrating that the segmented or secondary point transaction is not similarly situated to the shippers receiving discounts from the pipeline." *Id.* In *Granite State Gas Transmission* (*GSG*), 96 FERC ¶ 61,273 (2001), *reh'g denied*, 98 FERC ¶ 61,019 (2002), the Commission added the requirement that pipelines process a shipper's request for a discount in "no longer than two hours." 96 FERC ¶ 61,273, at 62,037. *See also Gulf S. Pipeline Co, L.P.,* 98 FERC ¶ 61,278 (2002) (applying *CIG/GSG* policy).

In February 2002 the Commission, reviewing Williston's compliance with Order No. 637, noted the company had not proposed changes in its pro forma tariffs relating to selective discounting and directed it to adopt the policy set forth in *CIG* and *GSG*. 98 FERC ¶ 61,212, at 61,803–04 (2002). Williston sought rehearing, arguing that because it is a reticulated rather than a linear pipeline, the *CIG/GSG* policy is harmful both to its shippers and to its system. The

Commission denied rehearing in June 2002. 99 FERC ¶ 61,-327 (2002).

Williston petitioned this court for review of both the February and June 2002 orders.

## II. Analysis

The Commission may require Williston to adopt new tariffs for selective discounting incorporating the policy the agency adopted in *CIG* and *GSG* only if it shows that Williston's existing rate or practice is "unjust, unreasonable, unduly discriminatory, or preferential" and that the Commission's proposed policy is both "just and reasonable." NGA § 5(a), 15 U.S.C. § 717d(a); *Interstate Natural Gas Ass'n of America (INGAA) v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002). To discharge this burden the Commission must "demonstrate that it has made a reasoned decision based upon substantial evidence in the record." *N. States Power Co. v. FERC*, 30 F.3d 177, 180 (D.C. Cir. 1994). Williston argues the orders under review "display an absence of factual analysis and fail to articulate a reasoned explanation" demonstrating that either the Commission's own discount policy prior to its adoption of the *CIG/GSG* policy or Williston's selective discounting was "unjust, unreasonable or unduly discriminatory."

In particular, Williston complains the Commission ignored the role selective discounting plays in assuring the pipeline "operational flexibility," namely, to "encourage the use of specific points because the firm shipper's use of those points will impact the physical gas flow in the pipeline network in a manner that permits Williston to maximize its pipeline capacity and system utilization." Application of the *CIG/GSG* policy to its system would undercut Williston's ability to target discounts in this manner. Williston also claims the Commission's policy would allow a shipper to obtain a long-term discount with respect to an underutilized portion of Williston's system and then to use the discount instead either to reduce its own shipments or to displace those of other shippers on more heavily utilized portions of the system. Williston explains that this could occur when a firm shipper changes its

delivery point, resulting in a "transaction[ ] with lower scheduling priority . . . not be[ing] scheduled." Williston's counsel elaborated upon this point at oral argument, explaining that an interruptible shipper may be displaced by a firm shipper because, "while the firm shipper is on the system[,] its capacity is guaranteed to it."

The Commission first responds broadly that Williston's claims "cannot override the Commission's authority to modify tariffs and contracts where necessary to further its competitive policies." In support of its application of the *CIG* policy to Williston, the Commission reiterates the rationale of that case, principally its view that restricting the discount offered a shipper to a particular point or points "undermines competition." In its order denying rehearing the Commission was a little more specific insofar as it disagreed with Williston's prediction of how shippers on its system would, if allowed, exploit the Commission's discounting policy: According to the Commission, shippers will not apply discounts obtained for underutilized portions of Williston's system to displace throughput in heavily utilized portions because "[t]he firm shipper changing points would pay the greater of its own discounted rate or the prevailing discounted rate at the alternate point."

As mentioned above, the Commission's determination that Williston's selective discounting was unjust and unreasonable, if it is to stand, must be supported by a reasoned decision based upon substantial evidence. In this context a generic paean to discounting simply will not do; as the Commission itself stated in *GSG*, "in each individual Order No. 637 compliance proceeding, pipelines can raise specific factual conditions on their pipeline that they believe warrant a change in the application of the discount policy to their pipeline." 98 FERC ¶ 61,019, at 61,055. The Commission's rejection of the pipeline's objections obviously must be responsive to the particular concerns raised by the pipeline.

In this case, the Commission did not adequately address Williston's concern, as stated in its Petition for Rehearing, that the *CIG/GSG* policy would compromise the pipeline's

ability to target discounts at "particular receipt/delivery points, subsystems or other defined geographical areas." Indeed, the Commission did not even mention Williston's practice of using discounts to manage "gas flow movements" across its system before concluding Williston's selective discounting was discriminatory, unjust, and unreasonable. Nor did the Commission consider whether its policy on selective discounting should be tailored to reflect the complexities Williston claims for its reticulated pipeline system.

Williston raised in its Petition for Rehearing its complaint that, despite the Commission's statements to the contrary, the Commission "change[d] the rules regarding selective discounting, and [it] d[id] so summarily, ... with no consideration of its statement that 'discount policies on reticulated pipelines need to be evaluated differently than those on straight-line pipelines.'" Williston's reticulated pipeline has multiple "lateral" lines, which results in a "complex grid or web-like system of numerous sized pipeline segments, ranging from 2 to 16 inches in diameter within its various sections." The Commission discussed the complexities of Williston's system in the course of considering Williston's segmentation proposal, 99 FERC ¶ 61,327, at 62,386–89, 62,394–95, but it did not explain why its imposition of the *CIG/GSG* policy would not impair Williston's ability to use selective discounting to ensure "operational flexibility" for its reticulated pipeline.

Nor did the Commission adequately explain why a shipper that agreed to pay the maximum rate for delivery to a secondary point should receive a discount there merely because it receives a discount at its primary point. The Commission says now that it was entitled to rely upon "general economic theory that the introduction of competition to the market will benefit consumers," *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 968 (D.C. Cir. 2000), and that it "reasonably concluded that prohibiting shippers from retaining discounts at secondary points where similarly situated shippers were receiving discounts unduly restricted competition in the capacity market." The Commission's posi-

tion is not supported, however, either by "general economic theory," or by specific evidence in the record of this case.

As for the record, the Commission does not point to any evidence casting doubt upon Williston's prediction that shippers will exploit the Commission's discounting policy to displace volumes of gas now moving on more heavily utilized portions of the system. Instead, the Commission merely points out, as it did in its order of June 2002, that a firm shipper applying its discount at a secondary point "never pays less than its contractual rate." While true, the observation is not at all responsive to Williston's claim that the availability at the secondary point of a discount for firm shippers will have adverse "consequences for pipeline system management and utilization." Nor does the Commission address the effect of its policy upon Williston's ability to sustain selective discounting. In its Petition for Rehearing Williston claimed the Commission's policy would limit the pipeline's ability to grant discounts. The Commission responds merely that Williston "may be correct," but the policy is necessary to achieve the Commission's goal of enhancing competition. Not surprisingly, this conclusory and contradictory remark (for without selective discounting the hoped for competition cannot materialize) is unsupported by any citation to evidence in the record. *Timpinaro v. SEC*, 2 F.3d 453, 459 (D.C. Cir. 1993).

As for "general economic theory," the Commission failed to explain what theory supports its conclusion that Williston's selective discounting, which restricted shippers' discounts to certain points, "*unduly* restricted competition in the capacity market." (Emphasis supplied.) As this court stated in *United Distribution Cos. v. FERC*, 88 F.3d 1105, 1142 (D.C. Cir. 1996), "the purpose of selective discounting is to increase throughput by allowing pipelines to engage in price discrimination in favor of demand-elastic customers. . . ." *See also* 1 ALFRED E. KAHN, THE ECONOMICS OF REGULATION: PRINCIPALS AND INSTITUTIONS 132–33 (reprint 1988). A pipeline is unlikely to be able to increase throughput by selective discounting, however, if capacity at secondary points can be transferred readily among shippers through resale at the discounted rate. Indeed, economic theory tells us price discrimination, of

which selective discounting is a species, is least practical where arbitrage is possible—that is, where a low-price buyer can resell to a high-price buyer. *See* JEAN TIROLE, THE THEORY OF INDUSTRIAL ORGANIZATION 134 (1988); *see also INGAA*, 285 F.3d at 32–33 (price discrimination not practical because, "given the ease with which capacity can be transferred between shippers, resellers would have no way to prevent arbitrage"). Yet this is precisely what the Commission's policy would appear not only to allow but to encourage. In sum, the Commission's unelaborated and, upon elaboration, unavailing invocation here of "general economic theory" fails to support its conclusion that Williston's selective discounting is unreasonable or unduly discriminatory.

Williston also objects to the Commission's rebuttable presumption that a shipper may transfer a discount to an alternate point if another "similarly situated" shipper is receiving a discount at that point. Williston argues this presumption impermissibly shifts to the pipeline the burden the Commission is required to shoulder under § 5 of the NGA. Intervenor Tennessee Gas Pipeline also argues the presumption is arbitrary and capricious regardless whether it can be rebutted. Because we vacate the Commission's orders for the reasons set forth above, we do not reach the merits of this issue.

### III. Conclusion

For the foregoing reasons, the petition for review is granted, the Commission's orders are vacated, and the matter is remanded to the Commission for further proceedings consistent herewith.

*So ordered.*