**William B. BLOUNT, Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, Respondent,**

**Municipal Securities Rulemaking Board, Intervenor.**

**No. 94–1336.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1994.

Decided Aug. 4, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied Oct. 4, 1995.

---

**42.** *See* note 7, *supra*.

Kevin T. Baine, Washington, DC, argued the cause, for petitioner. With him on the briefs, were Robert B. Barnett, Erik S. Jaffe, Lawrence Shore and Kevin M. Downey, Washington, DC.

Simon M. Lorne, Gen. Counsel, S.E.C., Washington, DC, argued the cause, for re-spondent. With him on the brief, were Jacob H. Stillman, Associate Gen. Counsel, and Eric Summergrad, Principal Asst. Gen. Counsel, S.E.C., Washington, DC. Paul Gonson, Washington, DC, entered an appearance, for respondent.

Harvey L. Pitt, Washington, DC, argued the cause, for intervenor. With him on the brief, was James H. Schropp, Washington, DC.

Before: WILLIAMS, HENDERSON and ROGERS, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

In late 1993, regulators of the municipal securities markets began to investigate reports that brokers and dealers were engaging in a variety of ethically questionable practices in order to secure underwriting contracts. These practices, often lumped together under the label "pay to play", include as a paradigmatic example the making of political contributions to state and local officials who may influence the choice of underwriter. Concerned that such practices were becoming more prevalent and were undermining the integrity of the $250 billion municipal securities market, the Municipal Securities Rulemaking Board ("MSRB" or "Board") drafted several new rules, which were then approved by the Securities and Exchange Commission. Among these was Rule G–37, the rule challenged in this case. See SEC Release No. 34–33868 (April 7, 1994) (order approving proposed rule change) ("*SEC Approval Order*").

The two principal sections of Rule G–37, (b) and (c), together restrict the ability of municipal securities professionals to contribute and to solicit contributions to the political campaigns of state officials from whom they obtain business. Section (d) serves as a loophole-closer, prohibiting indirect violations of the restrictions in (b) or (c). We describe each in turn.

*Contributions.* Section (b) prohibits any "broker, dealer, or municipal securities dealer" who has contributed "to an official of [an] issuer" from "engag[ing] in municipal securities business with [that] issuer" for a period

of two years after the contribution.[1] Contributions by a "municipal finance professional associated" with the broker or dealer are treated as equivalent to contributions by the broker or dealer itself; as are contributions by a political action committee "controlled" either by the broker or dealer or by "any municipal finance professional" whatsoever. The two-year restriction on business is not triggered, however, by any of these various parties' contribution of up to $250 per official per election to an official for whom that party is entitled to vote.

*Solicitations.* Section (c) prohibits brokers, dealers, and municipal securities dealers—as well as their associated municipal finance professionals—from soliciting or coordinating contributions to officials of any issuer with whom the broker, etc., is "engaging or is seeking to engage in municipal securities business."

*Loophole-closer.* Section (d) prohibits brokers, dealers, municipal securities dealers, and municipal finance professionals in general from "directly or indirectly" doing anything that would "result in a violation of sections (b) or (c)...."

The petitioner, William B. Blount, is the chairman of the Alabama Democratic Party and a registered broker and dealer of municipal securities. He challenges the SEC's order approving Rule G–37, claiming that each of the three sections of the rule we have described impermissibly infringes his First Amendment rights; that section (d) is, in addition, unconstitutionally vague; and that the rule as a whole violates the Tenth Amendment. The SEC rebuts each of these claims, and the MSRB, as intervenor, raises two defenses not urged by the SEC: that Blount does not have standing under the Exchange Act to pursue his claim and that the rule is not the product of government action and thus cannot violate either the First or Tenth Amendments. We find that Blount has standing to sue and that Rule G–37 is government action. We therefore meet all of Blount's arguments on the merits, though ultimately we reject them and deny the petition for review.

### I. Standing and Exhaustion

■ Neither the Board nor the SEC claims that Blount lacks constitutional or prudential standing, and given his roles as a state party chair and municipal securities dealer, any such claim would be meritless. Instead, the Board points to § 25(c)(1) of the Securities Exchange Act, 15 U.S.C. § 78y(c)(1), which requires that the objections in a petition for review have been "urged before the Commission", and argues that because Blount did not *himself* raise the present objections before the Commission, he is not a "person aggrieved" by the Commission's order within the meaning of § 25(a)(1) of the Securities Exchange Act, 15 U.S.C. § 78y(a)(1) (1988). We see nothing in either § 25(c)(1) or § 25(a)(1) that purports to link the two subsections together as the Board suggests. In addition, § 25(c)(1) conspicuously uses the passive voice, saying only that an objection may not be considered by a reviewing court unless it was "urged before the Commission"; it shows no interest in *who* urged the objection, and is presumably aimed only at assuring that the Commission have had a chance to address claims before being challenged on them in court. Cf. *NRDC v. EPA*, 824 F.2d 1146, 1150–51 (D.C.Cir.1987) (en banc).

The Commission indisputably had the necessary chance. The Board concedes that others raised and the SEC considered the "general constitutional objections to the Rule" that Blount now makes before us. See *SEC Approval Order* at 31–37 (considering constitutional objections). This quite accurate concession reduces the Board to the alternative argument that the SEC did not consider the "specific concerns identified by the Petitioner ... which arise from his particular status and duties as Chairman of the Alabama Democratic Party." While petitioner's activities may represent an unusually good example of the conduct the rule seeks to restrict, the Board does not explain, and we cannot see, how any of the issues the petitioner raises are in any salient way different from the concerns raised and consid-

---

1. "Municipal securities business" is defined for most purposes as excluding issues based on competitive bids. See Rule G–37(g)(vii); see also *SEC Approval Order* at 16 n. 41.

ered during the rulemaking. Blount's claim is therefore not barred by the exhaustion requirement of § 25(c)(1).

## II. Government Action

■ The Board maintains that it is a private organization and that Rule G–37 is a private rule. As such, the Board asserts, the rule cannot be found to violate the First or Tenth Amendments, since the Constitution is "a restraint on government action, not that of private persons", *CBS v. Democratic Nat'l Comm.*, 412 U.S. 94, 114, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1973) (plurality opinion).

We put to one side the Board's questionable assertion that it is a purely private organization even though it was created by an act of Congress and directed by Congress to "propose and adopt rules to effect the purposes of [the Exchange Act]" within specified constraints, § 78*o*–4(b)(2). Cf. *Lebron v. National R.R. Passenger Corp.*, —— U.S. ——, ——, 115 S.Ct. 961, 973, 130 L.Ed.2d 902 (1995) (fact that Amtrak was created by federal law to accomplish federal governmental objectives points toward classification as federal actor). What is critical here is that MSRB Rule G–37 operates not as a private compact among brokers and dealers but as federal law. Under § 15B of the Exchange Act, a broker or dealer may not engage in interstate trade in municipal securities unless he registers under § 15B itself or under § 15 of the Exchange Act. See 15 U.S.C. § 78*o*–4(a)(1) (forbidding dealers to use "instrumentality of interstate commerce" to effect or solicit transactions in municipal securities unless registered as a broker or dealer in accordance with § 15 or § 15B, 15 U.S.C. § 78*o* or § 78*o*–4). If he violates an MSRB rule, he may be sanctioned by revocation or suspension of his license to deal in municipal securities. See *id.* § 78*o*–4(c)(1) (forbidding brokers and dealers from contravening the rules of the MSRB in effecting or soliciting interstate transactions in municipal securities); § 78*o*(b)(4)(D) (authorizing the Commission to suspend or revoke the registration of any broker or dealer who "has willfully violated" or "is unable to comply with" any of the applicable rules, including those of the MSRB); § 78*o*–4(c)(2) (similar authority as

to municipal securities dealers). Dealers who violate Rule G–37 and who persist in securities dealing after any resulting Commission suspension or revocation of their licenses are subject to federal criminal penalties. 15 U.S.C. § 78ff(a) (providing for criminal penalties up to $1,000,000 and 10–year imprisonment for natural persons who willfully violate rules). As a government-enforced condition to any participation in a municipal securities career, Rule G–37 constitutes government action of the purest sort.

## III. First Amendment Challenge

We turn now to the central issue in this case, petitioner's claim that Rule G–37 violates his First Amendment rights to free speech and free association.

### A. Rule G–37 as a restriction of speech

All three sections of Rule G–37 at issue here infringe speech. Giving money is one method of indicating one's devotion to a cause; hence the familiar challenge, "Put your money where your mouth is." The Supreme Court has characterized the campaign contribution as a "symbolic act" that "serves as a general expression of support for the candidate and his views", though noting at the same time that the contribution does not indicate the basis for the support and that a limit on contributions does not "infringe the contributor's freedom to discuss candidates and issues." *Buckley v. Valeo*, 424 U.S. 1, 21, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976) (per curiam); see also *Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 299, 102 S.Ct. 434, 438–39, 70 L.Ed.2d 492 (1981). Solicitation of campaign funds, the target of sections (c) and (d), is close to the core of protected speech, as it is "characteristically intertwined" with both information and advocacy and essential to the continued flow of both. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 833–34, 63 L.Ed.2d 73 (1980).

### B. The requisite level of scrutiny

■ The intensity with which we scrutinize Rule G–37 depends on whether the rule is content-based, eliciting "strict" scrutiny, or

content-neutral, eliciting only "intermediate" scrutiny. *Turner Broadcasting Sys., Inc. v. FCC*, — U.S. —, — – —, 114 S.Ct. 2445, 2458–59, 129 L.Ed.2d 497 (1994). The proper categorization of Rule G–37 is not clear-cut. As petitioner points out, under the everyday meaning of the word "content", the rule appears to be content-based, as it restricts only messages that concern one "topic", specifically, financial contributions to political campaigns. Cf., e.g., *McIntyre v. Ohio Elections Comm'n*, — U.S. —, —, 115 S.Ct. 1511, 1529–30, 131 L.Ed.2d 426 (1995); *Consolidated Edison Co. v. Public Serv. Comm'n of New York*, 447 U.S. 530, 537, 100 S.Ct. 2326, 2332–33, 65 L.Ed.2d 319 (1980). But the Supreme Court does not regard a rule's use of subject-based categories as automatically establishing it as content-based. The critical issue is whether the state's justification for the distinction is the "content" of the speech itself or some other concern:

> The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.... Government regulation of expressive activity is content neutral so long as it is *"justified* without reference to the content of the regulated speech."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 294, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)) (emphasis added). Compare, e.g., *Turner Broadcasting*, — U.S. at —, 114 S.Ct. at 2467 (content-neutral regulation), and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (same), with *City of Cincinnati v. Discovery Network, Inc.*, — U.S. —, —, 113 S.Ct. 1505, 1517, 123 L.Ed.2d 99 (1993) (content-based regulation), and *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (same).[2]

This regulation's goals could well be described as content-neutral. Contributions and solicitation of contributions have two aspects. They may communicate support for a candidate and his ideas, but they may also be used as the cover for what is much like a bribe: a payment that accrues to the private advantage of the official and is intended to induce him to exercise his discretion in the donor's favor, potentially at the expense of the polity he serves. The SEC clearly rested its approval of Rule G–37 on a wish to curtail this latter function. In language tracking that of § 15B of the Exchange Act, 15 U.S.C. § 78o–4, it explained how the limits would, in its judgment, "prevent[ ] fraudulent and manipulative acts and practices, as well as the appearance of fraud and manipulation", *SEC Approval Order* at 26, perfect the mechanism of a free and open market for municipal securities, *id.* at 29, and "promote just and equitable principles of trade", *id.* at 30. Petitioner himself describes these goals as "non-speech-related." Petitioner's Br. at 27 n. 14.

These purposes are quite different from some of the ones that have triggered strict scrutiny in other cases involving political contributions. In *Buckley v. Valeo*, the interests "served by the Act include[d] restricting the voices of people and interest groups who have money to spend and reducing the overall scope of federal election campaigns", as well as "equalizing the relative ability of all voters to affect electoral outcomes". 424 U.S. at 17, 96 S.Ct. at 634. See also *id.* at 25–26, 96 S.Ct. at 637–38 (referring to "ancillary" interest in "serv[ing] to mute the voices of affluent persons and groups in the election process and thereby to equalize the relative ability of all citizens to affect the outcome of elections."); *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 660, 110 S.Ct. 1391, 1397, 108 L.Ed.2d 652 (1990) (regulation said to target "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to

---

**2.** This methodology has come to replace the distinction between speech and conduct regulations originally articulated in *United States v. O'Brien*, 391 U.S. 367, 375, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). See John Hart Ely, "Flag Desecration: A Case Study in the Roles of Cate-

gorization and Balancing in First Amendment Analysis", 88 Harv.L.Rev. 1482, 1496 (1975) (noting that the *O'Brien* Court itself adopts purpose test later in its opinion, "abandon[ing] its earlier suggestion that the constitutional answer can be found by examining *O'Brien's* act").

the public's support for the corporation's political ideas"); *FEC v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 263, 107 S.Ct. 616, 630–31, 93 L.Ed.2d 539 (1986) (similar); *FEC v. National Right To Work Committee,* 459 U.S. 197, 207, 103 S.Ct. 552, 559, 74 L.Ed.2d 364 (1982) (similar). Thus the object in *Buckley* and the other campaign finance cases was not only, as here, to prevent *direct* quid pro quos (and the appearance thereof) but more broadly to reduce the *indirect* impact of wealth on the electoral process, including the *persuasive impact* on both candidates and the public at large of messages communicated by the wealthy in that process. The Commission notes that in keeping with the difference in objectives, Rule G–37 is targeted narrowly to a concrete business relationship between the contributors and the candidates' governmental entities:

> Unlike general campaign financing restrictions, ... which seek to combat unspecified forms of undue influence and political corruption, [these] conflict of interest provisions, ... are tied to a contributor's business relationship with governmental entities and are intended to prevent fraud and manipulation.

*SEC Approval Order* at 34–35.

We are uncertain how much to make of this distinction. In *Buckley* the Court also said that "the primary interest served by the limitations ... is the prevention of corruption ... spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." 424 U.S. at 25, 96 S.Ct. at 638. At no point did the Court suggest that it saw a great divide between efforts to foreclose corruption disguised as campaign contributions and more general efforts to limit the influence of wealth. Moreover, the principle that the Commission claims narrows the rule's purpose—its focus only on "business relations"—is subject in the full-blown modern interest-group state to very broad generalization. The class of people with "business relations to government entities" is plentiful, if we include all government employees; all government contractors; all who benefit in their business from government activity creating a market for their goods or services (from lawyers specializing in SEC work to suppliers of environmental control technology); all whose businesses benefit from the imposition of regulatory, tax, or tariff restrictions on competitors or potential competitors; all whose income enjoys any kind of tax advantage; and all who are employed by or otherwise economically dependent on firms fitting the description above. The principle could also embrace anyone who (directly or through some group) is seeking to receive any such benefits and anyone seeking to stave off either the cancellation of existing benefits or the imposition of new burdens.

The only other basis for distinguishing the regulatory purposes asserted (and found to be content-based) in *Buckley* and its progeny from those asserted in this case is that the rules in the former cases were intended to safeguard the political process as a whole, whereas here the effort is to safeguard a commercial marketplace. But if the object of extirpating corruption—in the particular form of implicit exchanges between political contributions and politically allocated benefits—is content-based when the focus is on politics, we are uncertain why the object would be content-neutral when the focus is on the allocation of commercial benefits. In every case where a *quid* in the electoral process is being exchanged for a *quo* in a particular market where the government deals, the corruption in the market is simply the flipside of the electoral corruption.

Thus, although the purpose of preventing corrupt bond markets might logically be considered unrelated to the suppression of speech, our difficulty in distinguishing the purposes of this rule from those animating the rules at issue in *Buckley* and *Austin* makes us hesitate to find the rule content-neutral. If the rule can withstand strict scrutiny there is no need to decide the issue. Accordingly we turn to applying such scrutiny and ask, following *Boos,* 485 U.S. at 321, 108 S.Ct. at 1163–64, and *Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989), whether the rule is narrowly tailored to serve a compelling government interest.

## C. Application of strict scrutiny

We divide the inquiry into three parts, addressing in turn (1) whether the interests the government proffers in support of the rule are properly characterized as "compelling"; (2) whether the rule effectively advances those interests, i.e., whether the Commission has shown that the ills it claims the rule addresses in fact exist and the rule will materially reduce them, *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2470; and (3) whether the rule is narrowly tailored to advance the compelling interests asserted, i.e., whether less restrictive alternatives to the rule would accomplish the government's goals equally or almost equally effectively, *Sable Communications v. FCC,* 492 U.S. at 130–31, 109 S.Ct. at 2838–39. We conclude that the rule meets all three of these requirements.

### 1. Legitimate and compelling nature of interests asserted

■ Congress has charged the Commission and the MSRB to create rules

> to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, ... to remove impediments to and perfect the mechanism of a free and open market ..., and not ... to permit unfair discrimination between ... municipal securities brokers, or municipal securities dealers....

15 U.S.C. § 78o–4(b)(2)(C). The Commission claims that Rule G–37 supports two interests encompassed within this mandate: (1) protecting investors in municipal bonds from fraud and (2) protecting underwriters of municipal bonds from unfair, corrupt market practices. Both of these interests are not only substantial, see *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2470 ("[T]he Government's interest in eliminating restraints on fair competition is always substantial....") (citing cases), but, we think,

compelling. The Supreme Court has said that "preventing corruption or the appearance of corruption" is "the only legitimate and compelling government interest[ ] thus far identified for restricting campaign finances." *FEC v. National Conservative PAC,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1468–69, 84 L.Ed.2d 455 (1985) (citing the holdings in *Buckley* and *Citizens Against Rent Control* ). As we have already noted, in *Buckley* and *Austin* the legislature was interested in clean elections, whereas here the SEC is interested in clean bond markets. Petitioner insists on the importance of this distinction, saying that the latter interest is less compelling than the former. As we see it, however, one of the primary reasons people object to bought elections is that a bought politician tends to make distorted choices, and the public's concern about a particular type of distorted choice (the choice of bond underwriter) does not logically stand on a lower plane than its concern about bought politicians generally.

### 2. Tendency of the rule to further those interests

Petitioner also maintains that the Commission has failed to provide evidence sufficient to show "that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2470.[3] As a threshold matter, petitioner claims there is no support for the Commission's finding that pay-to-play practices are prevalent in the negotiated municipal bond business, because the record contains no evidence of specific instances of quid pro quos. But underwriters' campaign contributions self-evidently create a conflict of interest in state and local officials who have power over municipal securities contracts and a risk that they will award the contracts on the basis of benefit to their campaign chests rather than to the

---

**3.** We note petitioner's suggestion that the Commission's failure to support its findings with record evidence violates, in addition to the First Amendment, the Securities and Exchange Act, 15 U.S.C. §§ 78y(a)(4), 78y(b)(4) (rules must be supported by "findings ... as to the facts" and "substantial evidence"), and the Administrative Procedure Act, see 5 U.S.C. § 706(2)(e); *Tex Tin*

*Corp. v. EPA,* 992 F.2d 353, 356 (D.C.Cir.1993) (agency is not "entitled merely to assume" that the practices it seeks to regulate cause the harm it fears). Because the First Amendment requires us to scrutinize the factual basis for the regulation at least as stringently as these statutes, we see no need to address these contentions separately.

governmental entity. Petitioner himself remarked on national radio that "most likely [state and local officials] are gonna call somebody who has been a political contributor" and, at least in close cases, award contracts to "friends" who have contributed. *Morning Edition* (National Public Radio, June 1, 1994), *available in* LEXIS, News Library, Transcript No. 1358–9. While the risk of corruption is obvious and substantial, actors in this field are presumably shrewd enough to structure their relations rather indirectly—indeed, the phrase "pay to play" suggests that a contribution brings the donor merely a chance to be seriously considered, not the assurance of a contract. As the Court said of quid pro quos for campaign contributions in *Buckley v. Valeo*, "the scope of such pernicious practices can never be reliably ascertained." 424 U.S. at 27, 96 S.Ct. at 638. In any event, the Commission observes that "[s]pecific abuses have been alleged in several state and local governments", *SEC Approval Order* at 8–11, and then cites newspaper clippings from 13 states and the District of Columbia with such headlines as "Kentucky Official Says He Served as Middleman to Solicit Funds", from *The Bond Buyer*, September 7, 1993. Although the record contains only allegations, no smoking gun is needed where, as here, the conflict of interest is apparent, the likelihood of stealth great, and the legislative purpose prophylactic. See *FEC v. National Right to Work Committee*, 459 U.S. 197, 210, 103 S.Ct. 552, 560–61, 74 L.Ed.2d 364 (1982) (Court will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.").

Even assuming the prevalence of quid pro quos, Blount maintains, the Commission has not demonstrated that eliminating such activity advances the asserted interests in protecting investors and promoting just and equitable principles of trade. As to the harm to investors, we tend to share the petitioner's skepticism. The Commission reasoned that pay-to-play practices make underwriters "less likely or competent to perform a reasonable investigation of statements made by the issuer in connection with the offering". *SEC Approval Order* at 27–28. The Commission points to no data supporting the idea,

and it is anything but self-evident. Two interests seem to give the underwriter an incentive to exercise due diligence in investigating municipal issuers: its interest in averting liability for fraud, see *SEC Approval Order* at 26 n. 54 (noting that securities laws impose on underwriters a legal duty to investigate), and its interest in safeguarding its reputation among bond buyers and their representatives. Neither interest would be diminished merely by an underwriter's use of sleazy means to secure the contract. And while an implicit (or even explicit) offer to refrain from investigating thoroughly might well help an underwriter win a negotiated contract, it would help regardless of whether the underwriter also used other means of ingratiating himself with the powers that be.

On the other hand, the link between eliminating pay-to-play practices and the Commission's goals of "perfecting the mechanism of a free and open market" and promoting "just and equitable principles of trade" is self-evident. The Commission explained:

"Pay to play" practices raise artificial barriers to competition for those firms that either cannot afford or decide not to make political contributions. Moreover, if "pay to play" is the determining factor in the selection of an underwriting syndicate, an official may not necessarily hire the most qualified underwriter for the issue.... "Pay to play" practices undermine [just and equitable] principles [of trade] since underwriters working on a particular issuance may be assigned similar roles, and take on equivalent risks, but be given different allocations of bonds to sell—resulting in differing profits—based on their political contributions or contacts.

See *SEC Approval Order* at 29–30. Moreover, there appears to be a collective action problem tending to make the misallocation of resources persist. As beneficiaries of the practice, politicians vying for state or local office may be reluctant to stop it legislatively; some, of course, may seek to exploit their rivals' cozy relation with bond dealers as a campaign issue, but if they refuse to enter into similar relations, their campaigns will be financially handicapped. Bond dealers are in a still worse position to initiate reform: indi-

vidual firms that decline to pay will have less chance to play, and may even be the object of explicit boycott if they do. See "Politicians Are Mobilizing to Derail Ban on Muni Underwriters", *Wall St. J.*, Dec. 27, 1993, at C16 (reporting that Florida Association of Counties called for a boycott of 17 firms that had voluntarily banned political contributions).

Even if the regulation does advance the asserted interests, Blount says, it should be stricken as underinclusive. He points out that the prohibitions on contributions and on solicitation of contributions obviously will not eliminate *all* possible methods by which underwriters may curry favor. Municipal finance professionals remain free, for example, to solicit votes or contribute time and talents to a campaign effort. He also notes that the limitations of Rule G–37 do not apply to chief executive officers of banks with municipal securities departments or subsidiaries.

But a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective. The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals. While the rule chosen must "fit" the asserted goals, *City of Cincinnati,* — U.S. at ——, 113 S.Ct. at 1516, it must also, by virtue of the narrow tailoring requirement discussed below, strike an appropriate balance between achieving those goals and protecting constitutional rights. Because the primary purpose of underinclusiveness analysis is simply to "ensure that the proffered state interest actually underlies the law", *Austin,* 494 U.S. at 677, 110 S.Ct. at 1407 (Brennan, J., concurring), a rule is struck for *under*inclusiveness only if it cannot "fairly be said to advance any genuinely substantial governmental interest", *FCC v. League of Women Voters,* 468 U.S. 364, 396, 104 S.Ct. 3106, 3126, 82

L.Ed.2d 278 (1984), because it provides only "ineffective or remote" support for the asserted goals, *id.* (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980)), or "limited incremental" support, *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 73, 103 S.Ct. 2875, 2883–84, 77 L.Ed.2d 469 (1983). See also *Florida Star v. B.J.F.,* 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) (government "must demonstrate its commitment to advancing [its] interest by applying its prohibition evenhandedly.... Without more careful and inclusive precautions against alternative forms of [the harm], we cannot conclude that Florida's selective ban ... satisfactorily accomplishes its stated purpose."). Thus, with regard to First Amendment *under*inclusiveness analysis, neither a perfect nor even the best available fit between means and ends is required.[4]

In citing the Commission's failure to cover the CEOs of banks with municipal securities departments as evidence of fatal underinclusiveness, petitioner invokes *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2295–96, 65 L.Ed.2d 263 (1980), which he reads as requiring a "substantial interest" to justify a class's *exemption* from a speech restriction (under an equal protection analysis). Even assuming that that is a correct reading of *Carey,* the decision clearly related to an exemption based on the *content* of the subject's expression (labor matters), see *id.,* and petitioner makes no claim that content played any role whatever in the Commission's exclusion of bank CEOs.

We have already explained why and how we think the provisions of Rule G–37 at issue can be expected materially to advance compelling interests asserted by the Commission. The Commission has explained that the "loopholes" that remain are due to its "sensi-

---

**4.** Petitioner tosses into his opening brief a footnote contending that the Commission's failure to make Rule G–37 applicable to bank officers and bank-controlled political action committees makes for disparate treatment that violates not only the First Amendment but also the due process clause of the *Fifth* Amendment. We find it unnecessary to evaluate this contention. The Fifth Amendment requires only that the government have a rational basis for its distinction, see,

e.g., *Vance v. Bradley,* 440 U.S. 93, 109, 99 S.Ct. 939, 948–49, 59 L.Ed.2d 171 (1979) ("Rather than abandoning its primary end completely, or unnecessarily including all federal employees within the means, it drew a line around those groups of employees it thought most generally pertinent to its objective."); and rational-basis review requires, if anything, *less* "mathematical nicety", *id.* at 109, 99 S.Ct. at 948–49, than the First Amendment requires.

tivity" to First Amendment concerns; it believes that closing the supposed loopholes would broaden the regulation's scope beyond that "necessary" to accomplish its interests. In other words, the Commission adjudged the risk of corruption in the conduct left unrestrained too remote to warrant restraint. In our view, petitioner has pointed to nothing that calls that judgment into serious question.

### 3. Narrow tailoring

Blount asserts that Rule G–37 is too broad, arguing that the Commission could have achieved its goal with less restrictive means. Specifically, he claims, it could have confined itself to disclosure and record-keeping requirements (which the Commission instituted in Rule G–37(e) and Rules G–8 and G–9); or, at worst, to those requirements plus the contribution limits of Rule G–37(b). In other words, the Commission probably had no need to curtail *contributions*, Rule G–37(b), and certainly had no need to curtail *solicitation* of contributions, Rule G–37(c).

If the Commission's goals were only to protect the investing public, disclosure and record-keeping requirements might do the job. Informed investors—insofar as they believe contributors are less likely to investigate issuers or more likely to overprice issues—could use the disclosed information to avoid buying bond issues underwritten by campaign contributors. As we pointed out above, however, it is not at all clear that investors are harmed or even perceive themselves to be harmed when underwriters obtain business through shady practices. Thus disclosure would not likely cause market forces to erode "pay to play", and the Commission's other grounds for objecting to the practice would go unmet. Just as the Court in *Buckley v. Valeo* said that Congress could have found disclosure "only a partial measure", 424 U.S. at 28, 96 S.Ct. at 639, so here

the Commission could reasonably find it inadequate. Moreover, without the prohibitions of sections (c) and (d) on soliciting contributions, directly or indirectly, underwriters could easily circumvent the prohibition against direct contributions. Not only would the Commission's purpose of protecting the integrity of the market for underwriting services most certainly "be achieved less effectively", *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758, without the limits on campaign contributions and solicitation, but none of the alternatives presented would be even *almost* equally effective. Cf. *Sable Communications v. FCC,* 492 U.S. at 130–31, 109 S.Ct. at 2838–39 (narrow tailoring requirement not met when the record suggests a less restrictive and possibly "extremely effective" alternative); *Boos,* 485 U.S. at 329, 108 S.Ct. at 1168 (requirement not met when there is evidence that Congress itself "no longer considers this statute necessary" to meet the stated objective and when "a less restrictive alternative is readily available").

Finally, the regulation is "closely drawn" and thus "avoid[s] unnecessary abridgement" of First Amendment rights, *Buckley v. Valeo,* 424 U.S. at 25, 96 S.Ct. at 638. Rule G–37 constrains relations only between the two potential parties to a quid pro quo: the underwriters and their municipal finance employees on the one hand, and officials who might influence the award of negotiated municipal bond underwriting contracts on the other.[5] Even then, the rule restricts a narrow range of their activities for a relatively short period of time. The underwriter is barred from engaging in business with the particular issuer for only two years after it makes a contribution, and it is barred from soliciting contributions only during the time that it is engaged in or seeking business with the issuer associated with the donee. A municipal finance professional may contribute

---

**5.** The rule does not apply to underwriting business awarded on a competitive basis, that is, "offerings in which the securities are awarded to the underwriting syndicate presenting the best bid according to stipulated criteria set forth in the notice of sale." *SEC Approval Order* at 16 n. 41; see also Rule G–37(g)(vii)(A). Although the rule might be interpreted as applying to private placement or advisory service business awarded

on a competitive basis, see Rule G–37(g)(vii)(B) and (C), none of the parties mentions this possibility, and petitioner does not contend that he engages in such business. It is therefore unnecessary for us to address the constitutionality of those parts of the rule. See *Burson v. Freeman,* 504 U.S. 191, 210 n. 13, 112 S.Ct. 1846, 1857 n. 13, 119 L.Ed.2d 5 (1992).

up to $250 per election to each official for whom he or she is entitled to vote, without triggering the business bar. Furthermore, as the Commission interprets the rule, municipal finance professionals are not in any way restricted from engaging in the vast majority of political activities, including making direct expenditures for the expression of their views, giving speeches, soliciting votes, writing books, or appearing at fundraising events. *SEC Approval Order* at 19 ("proposal will not restrict personal volunteer work . . . in political campaigns other than soliciting or coordinating contributions"); *id.* at 36 ("proposal does not restrict uncoordinated independent expenditures"); SEC Release No. 33870 (Apr. 7, 1994) (*"SEC Order Denying Preliminary Stay"*) at 8 (ban on solicitation applies only to "explicit solicitations of contributions, and not to generalized solicitations of support for a candidate or his views."); SEC Release No. 34008 (May 4, 1994) (*"SEC Order Denying Stay"*) at 12 ("[A]pplicant's concern that the provision could be triggered by inadvertently using the word 'money' in a speech urging support for a candidate, or simply by making a speech of general support at a fund-raising affair, is misplaced. Likewise, his contention that soliciting money for his political party will necessarily trigger the provision is incorrect."); but cf. *id.* at 6 (noting that Blount's complaint is that the rule will prevent him from directing contributed funds to particular state officials, which is normally a duty of the party chairman, and appearing to assume that the rule will have the feared effect).

## IV. Vagueness

Petitioner argues that section (d), prohibiting anyone from "directly or indirectly, through or by any other person or means" doing what sections (b) and (c) prohibit, is unconstitutionally vague and in violation of his due process rights under the Fifth Amendment. See, e.g., *Timpinaro v. SEC,* 2 F.3d 453, 460 (D.C.Cir.1993) ("A vague rule denies due process by imposing standards of conduct so indeterminate that it is impossible to ascertain just what will result in sanctions.") (citation and internal quotation marks omitted); see also *Hynes v. Mayor & Council of Oradell,* 425 U.S. 610, 619, 96

S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) ("The general test of vagueness applies with particular force in review of laws dealing with speech. . . . [A] man may less be required to act at his peril here, because the free dissemination of ideas may be the loser.") (citation and internal quotation marks omitted).

Although the language of section (d) itself is very broad, the SEC has interpreted it as requiring a showing of culpable intent, that is, a demonstration that the conduct was undertaken "as a means to circumvent" the requirements of (b) and (c). *SEC Approval Order* at 19; see also *SEC Order Denying Stay* at 6 n. 7 (prohibition only affects Blount's family to the degree that "he is directing their contributions, thus seeking to evade the rule's provisions"). The SEC states its "means to circumvent" qualification in general terms. The qualification appears, therefore, to apply not only to such items as contributions made by the broker's or dealer's family members or employees, but also to gifts by a broker to a state or national party committee, made with knowledge that some part of the gift is likely to be transmitted to an official excluded by Rule G–37. In short, according to the SEC, the rule restricts such gifts and contributions only when they are intended as end-runs around the direct contribution limitations.

Moreover, the Commission has substantially reduced any remaining uncertainty about the rule's potential application by providing for informal advance rulings from SEC staff on any proposed course of conduct, see 17 CFR §§ 202.1(d) & 202.2. This helps protect underwriters against the sort of risk that the constitutional rule against vagueness seeks to constrain. See *Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 580, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796 (1973) (taking existence of such a procedure into account). And, of course, if the SEC actually brings an enforcement action, the affected party may challenge the particular application of the rule as not reasonably foreseeable under the rule's language. See, e.g., *General Elec. Co. v. EPA,* 53 F.3d 1324, 1330 (D.C.Cir.1995) (agency's interpretation of a rule, though permissible, may yet be "so far from a reasonable person's understanding" of

what the rule might mean that the rule cannot be said to give the "fair notice" necessary for due process).

### V. Tenth Amendment Challenge

 Finally, petitioner claims that Rule G–37 is an effort to regulate state election campaigns and, as such, usurps the states' power to control their own elections. This contention is meritless. Rule G–37 neither compels the states to regulate private parties, as the Tenth Amendment prohibits, *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), nor regulates the states directly, a question on which the Supreme Court's Tenth Amendment jurisprudence "has traveled an unsteady path", *id.* at 160, 112 S.Ct. at 2420. Further, the rule does not have anything resembling the kind of preemptive effect on states' ability to control their own election processes that might be perceived as "destructive of state sovereignty". See *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 554, 105 S.Ct. 1005, 1019, 83 L.Ed.2d 1016 (1985); cf. *Gregory v. Ashcroft,* 501 U.S. 452, 460–62, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991). Blount points to no theory of the Tenth Amendment or the commerce clause under which Congress is disabled from regulating private persons in their conduct of interstate trade in municipal securities, see 15 U.S.C. § 78o–4(a)(1), so we need not proceed further. See generally *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

\*   \*   \*   \*   \*   \*

Because Rule G–37 withstands all of Blount's challenges, the petition for review is

*Denied.*