DEBRA ANN LIVINGSTON, Circuit Judge,
concurring in part and concurring in the judgment:
I join in Parts I, II and III.A of the majority opinion. I write separately as to Part III.B-E only to make clear my disagreement with the majority’s conclusion that improper or undue influence is a form of corruption that may be addressed with closely drawn contribution limits. To the extent that this conclusion is one basis on which the majority upholds the special contribution limits and non-matching provisions that New York City’s campaign finance law imposes on those “doing business” with the City, I respectfully disagree with its analysis.[1] I nevertheless conclude that these provisions pass constitutional muster pursuant to the Supreme Court’s and this Court’s precedents. Accordingly, *202 I concur in the judgment as expressed in Part III.B-E.
Since the enactment of its Campaign Finance Act (“CFA”) in 1988, New York City has imposed limits on the amount of money that may be contributed to a single candidate for public office in a given calendar year.[2] These generally applicable limits are $4,950 to each candidate running for mayor, public advocate, or comptroller; $3,850 to each candidate running for borough president; and $2,750 to each candidate running for city council. N.Y.C. Admin.Code §§ 3-703(l)(f), 3-703(7), 3-719(2)(b); Loprest Deck ¶ 16. The appellants here take no issue with these generally applicable limits, but rather with subsequent limits enacted in 2007 and applicable only to individuals defined in the CFA as “doing business” with the City of New York. For natural persons who are classified as “doing business” with the City, significantly stricter limits apply: $400 to candidates for mayor, public advocate, or comptroller; $320 to candidates for borough president; and $250 to candidates for city council. N.Y.C. Admin. Code §§ 3-703(l-a), 3-719(2)(b); Loprest Deck ¶ 39.
“Doing business” contributors include, inter alia, individuals with specified ownership or management roles in entities with valuable City contracts or grants, or relations with the City that concern the acquisition or disposition of real property.[3] Lobbyists are also included within the stricter contribution limits. N.Y.C. Admin. Code § 3-702(18)(a). Collective bargaining between the City and municipal labor organizations, however, does not constitute “doing business.” Simpson Deck ¶ 8. Moreover, the statutory text suggests that some neighborhood and community organizations and their members are not subject to the contribution limits even when these organizations engage in certain activities that would otherwise qualify as “doing business” with the City.[4] “Doing business” contributors are strictly limited in their contributions as compared to others: they may donate only approximately one *203 twelfth as much to a candidate as those who are deemed not to be “doing business” with the City. Because the “doing business” contribution limits, unlike the regular limits, are not indexed for inflation, moreover, the disparity between these two sets of limits is only likely to increase over time. Compare N.Y.C. Admin. Code §§ 3-703(1)®, 3-703(7) vnth id. § 3-703(l-a).
The City also operates a public campaign financing program in which candidates for the various City offices specified above may choose to participate. In this program, the City matches the campaign contributions of most individuals to candidates who participate in the public funding program at a rate of six to one (with up to $1,050 of public funds available for matching per contributor per candidate). Id. § 3-705(2)(a); Loprest Decl. ¶ 11. Contributions from lobbyists or other persons “doing business” with the City, however, are not eligible for matching.[5] N.Y.C. Admin. Code §§ 3-702(3)(g)-(h), 3-703(l-a); Loprest Decl. ¶ 12. Thus, an individual who does not fall into one of these two categories is entitled, for example, both to contribute $4,950 to a candidate for mayor and—if the candidate to whom the individual is making a contribution is participating in the City’s public financing program and is otherwise eligible to receive matching funds—to have that contribution supplemented with $1,050 for a total contribution of $6,000. The “doing business” contributor, in contrast, is limited to a contribution of $400 alone.
I agree with the majority that the “doing business” contribution limitations in this case are subject to scrutiny for whether “they are closely drawn to serve a sufficiently important interest.” Davis v. FEC, 554 U.S. 724, 737, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (internal quotation marks omitted); see Maj. Op. at 185-86. The Supreme Court has repeatedly indicated that, while expenditure limitations are subject to strict scrutiny, which requires courts to assess whether the challenged “restriction ‘furthers a compelling interest and is narrowly tailored to achieve that interest,’ ” Citizens United v. FEC, — U.S. —, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (quoting FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (opinion of Roberts, C.J.)), contribution limits are subject to less searching scrutiny because campaign contributions “lie closer to the edges than to the core of political expression.” FEC v. Beaumont, 539 U.S. 146, 161, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003); see also Nixon v. Shrink Mo. Gov’t PAC, 528 U.S. 377, 387-88, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000); Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). At the same time, with regard to contribution no less than expenditure limits, the First Amendment “has its fullest and most urgent application precisely to the conduct of campaigns for political office.” Buckley, 424 U.S. at 15, 96 S.Ct. 612 (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971)) (internal quotation mark omitted). The scrutiny required by the First Amendment is thus both “exacting,” see id. at 16, 96 S.Ct. 612; Shrink Mo., 528 U.S. at 386, 120 S.Ct. 897, and *204 “rigorous,” Buckley, 424 U.S. at 29, 96 S.Ct. 612.
I likewise agree that the non-matching provisions here are similarly subject to “closely drawn” analysis. See Maj. Op. at 193. At least in the circumstances in this case, matching funds given to a candidate as a result of a contribution from a private donor are the functional equivalent of a contribution, so that limits on such funds are functionally equivalent to contribution limits. See FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 456, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (determining that “party coordinated spending [is] the functional equivalent of contributions,” id. at 447, 121 S.Ct. 2351, and accordingly applying “scrutiny appropriate for a contribution limit,” id. at 456, 121 5. Ct. 2351). Therefore, this Court must analyze both sets of provisions to determine whether “they are closely drawn to serve a sufficiently important interest.” Davis, 554 U.S. at 737, 128 S.Ct. 2759 (internal quotation marks omitted). The City bears the burden of proof in this inquiry. Shrink Mo., 528 U.S. at 387-88, 120 S.Ct. 897.
I part ways with the majority, not in our shared conclusion as to the constitutionality of the provisions here, but in determining what counts as a “sufficiently important interest” in relation to which the provisions must be judged. Pursuant to the Supreme Court’s decision in Buckley, preventing “the actuality and appearance of corruption” is such an interest. Buckley, 424 U.S. at 26, 96 S.Ct. 612. The majority, however, goes beyond Buckley in concluding that “improper or undue influence ... qualifies as a form of corruption” which may be combated via closely drawn contribution limits. Maj. Op. at 186 (emphases omitted). Because recent decisions by the Supreme Court and this Court clearly foreclose this latter determination, I respectfully disagree with it.
In Citizens United, the Supreme Court unequivocally stated that when Buckley identified the prevention of corruption or its appearance as “a sufficiently important governmental interest” to render closely drawn contribution limits acceptable under the First Amendment, “that interest was limited to quid pro quo corruption.” 130 S.Ct. at 909 (emphasis added).[6] The Court recognized that favoritism and influence, unlike corruption, are unavoidable in representative politics, in which a legitimate and substantial reason for casting a ballot or making a contribution “is that the candidate will respond by producing those political outcomes the supporter favors.” Id. at 910 (quoting McConnell v. FEC, 540 U.S. 93, 297, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (Kennedy, J., concurring in the judgment in part and dissenting in part), overruled in part on other grounds by Citizens United, 130 S.Ct. 876). In a democracy premised on responsiveness, the Court said, the mere fact “that speakers may have influence over or access to elected officials does not mean that these officials are corrupt.” Id. And importantly, *205 reliance on a generic influence theory to justify limiting political speech is, itself, dangerous—“at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.” Id. (quoting McConnell, 540 U.S. at 296, 124 S.Ct. 619 (Kennedy, J., concurring in the judgment in part and dissenting in part)) (internal quotation mark omitted).
Even if it were not clear after Citizens United (as, in fact, it is) that First Amendment freedoms may not be curtailed to address mere influence or the perception of such influence in the political arena, any question about whether Citizens United’s pronouncement applies in the context of contribution limits was resolved by this Court in Green Party of Connecticut v. Garfield, 616 F.3d 189 (2d Cir.2010). There, the Court addressed the validity of Connecticut’s bans on campaign contributions to candidates for state office from state contractors and lobbyists. See id. at 194. Some of the evidence before the Green Party panel “suggested] that many members of the public generally distrust lobbyists and the ‘special attention’ they are believed to receive from elected officials.” Id. at 206. This Court said there that “influence and access,” without more, “are not sinister in nature,” but are part of representative government. 616 F.3d at 207. Citing Citizens United, the Court held that “evidence demonstrating that lobbyist contributions give rise to an appearance of ‘influence’ has no bearing on whether the ... ban on lobbyist contributions is closely drawn to the state’s anti-corruption interest.” Id. at 207 (citation omitted).
The majority distinguishes between “mere influence or access to elected officials” and “improper or undue influence,” suggesting that while the former may be an insufficient basis on which to limit First Amendment freedoms, the latter is not. Maj. Op. at 186 & n. 14. To be clear, if “improper or undue influence” means nothing more than an appearance of quid pro quo corruption arising, as Buckley put it, “from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions,” 424 U.S. at 27, 96 S.Ct. 612, I have no quibble with the majority’s position. Citizens United, however, clearly “rejected a claimed governmental interest ‘in equalizing the relative ability of individuals and groups to influence the outcome of elections,’ and rejected the concern over the ‘undue influence’ of money serving as a form of corruption that justifies regulation.” Samuel Issacharoff, On Political Corruption, 124 Harv. L. Rev. 118, 125-26 (2010) (quoting Citizens United, 130 S.Ct. at 904). Thus, contribution limits are acceptable only when they are closely drawn to tackle real or apparent quid pro quo corruption.
This is no unimportant point. By requiring that a regulation suppressing political speech and association be closely drawn to address the threat of quid pro quo corruption (or the perception that large contributors will secure their quid), courts strive to draw a principled constitutional line—a line that permits legislatures to address the significant danger corruption poses to representative democracy while it vigorously protects political speech by ensuring that First Amendment principles are enforced. The generic influence theory is, in contrast—and as the Citizens United Court recognized—“susceptible to no limiting principle.” Citizens United, 130 S.Ct. at 910 (quoting McConnell, 540 U.S. at 296, 124 S.Ct. 619 (Kennedy, J., concurring in the judgment in part and dissenting in part)) (internal quotation mark omitted). Today it disfavors “doing business” contributors. But all those who seek to influence politicians are vulnerable *206 to being perceived as having influence that is “undue.” If demonstrating such a perception is enough to bear the legislature’s First Amendment burden in justifying restrictions on speech and association, that burden is light indeed.
Focusing properly only on the prevention of quid pro quo corruption or its appearance, I next conclude that the New York City restrictions at issue are “closely drawn” to serve the interest which justifies the limitations they place on First Amendment rights. Because I find this question more difficult than my colleagues, however, I write briefly to explain my position.
The Supreme Court has not yet addressed the First Amendment implications of campaign finance laws that impose stricter contribution limits on the political contributions of some individuals who are seen to pose a particularly serious threat to the government’s interest in preventing the appearance or actuality of quid pro quo corruption. Federal law has long prohibited government contractors from making contributions to “any political party, committee, or candidate for public office or to any person for any political purpose or use” while these contractors are seeking or performing pursuant to a contract. The relevant provision, however—2 U.S.C. § 441c—has not come before the Court. This Court in Green Party upheld a contribution ban imposed on Connecticut contractors and related individuals in the wake of a corruption scandal, 616 F.3d at 205, but invalidated a ban imposed on lobbyists and their families, finding insufficient evidence to demonstrate that all such contributions give rise to an appearance of corruption, id. at 206-07. Other courts have upheld laws limiting in various ways the campaign contributions of casino operators, see Casino Ass’n of La. v. State ex rel. Foster, 820 So.2d 494 (La.2002), lobbyists, see N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705 (4th Cir.1999), and municipal bond traders, see Blount v. SEC, 61 F.3d 938 (D.C.Cir.1995). But the case law is relatively sparse, and no case has addressed a set of limits precisely analogous to those here.
The law at issue, to survive First Amendment scrutiny, must both serve the City’s anticorruption interest and be “closely drawn” to achieve this interest. There is reason to question whether New York City’s “doing business” restrictions satisfy this test. Thousands of New Yorkers are severely restricted in the amounts they may contribute or have matched as a result of these restrictions, some by virtue of no more than a family relationship or their leadership positions in institutions such as the Metropolitan Museum of Art or the Cathedral Church of St. John the Divine. See Joseph Goldstein, City Blacklist Limits Giving by 12,000, N.Y. Sun, August 14, 2008, http://www.nysun.com/ new-york/city-blacklist-limits-giving-by-12000/83868. By contrast, other New Yorkers who would qualify as “doing business” with the City under any ordinary understanding of the term (such as those leading municipal labor unions) are subject only to the higher limits. Furthermore, New York’s law restricts “doing business” contributions to campaigns for specified City offices regardless of whether the particular office at stake plays any role in the business relationship that is the trigger for the stricter limits.[7] Despite the magnitude of *207 the disparity between contributions permitted from the disfavored “doing business” contributors and the rest of the polity, moreover, in terms of the amounts they may contribute, there is reason to question whether this stark difference in treatment is in fact necessary—whether the new limits are more effective at preventing actual or apparent corruption than the generally applicable contribution limits that preceded them. Indeed, there is little record evidence of any quid pro quo corruption involving a New York City official since the enactment of the generally applicable limits over 20 years ago.[8]
The majority relies in part on the “objective[ ] reasonableness]” of “the connection between money and municipal action” to uphold the strict limits New York City’s law places upon the free speech and associational rights of those “doing business.” Maj. Op. at 190. The Supreme Court has stated, however, that “[w]hen the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural.” Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion) (citation omitted) (internal quotation marks omitted); see also Colo. Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 618, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (opinion of Breyer, J.) (applying Turner in the campaign finance context); Shrink Mo., 528 U.S. at 392, 120 S.Ct. 897 (“We have never accepted mere conjecture as adequate to carry a First Amendment burden .... ”). Requiring the City to point to evidence demonstrating its anticorruption concern, moreover, does not amount to “giving every corruptor at least one chance to corrupt.” Maj. Op. at 188. Reports of recent scandals are one form of evidence that tends to show corruption or its appearance, see, e.g., Green Parly, 616 F.3d at 200, but so do other forms of evidence, including, inter alia, testimony by those familiar with the political life of the community, see Shrink Mo., 528 U.S. at 393, 120 S.Ct. 897, and surveys of the populace, see id. at 394, 120 S.Ct. 897.
On balance, however, and upon a close examination of the record, I agree with the majority’s conclusion that the City has adequately demonstrated that its “doing business” contribution limits address a real and not a conjectural corruption concern. First, a report prepared for the Campaign Finance Board (“CFB”) in 2006 reported that those “doing business” with the City tend to give larger contributions to candidates (albeit within the 1988 contribution limits) as compared to those lacking such business relationships. See Loprest Deck, Ex. A, Municipal Campaign Finance and “Pay-to-Play”: An Analysis of Doing Business Contributions in New York City (“Pay-to-Play Report”) at 12.[9] *208 The Report cites to specific instances of large donations by real estate developers, in particular, during the very period when matters in which these developers had an interest were pending before City authorities. See id. at 31-37. Even without evidence that such contributions were made in exchange for a quid, they could well foster the appearance of corruption in City politics. See Buckley, 424 U.S. at 27, 96 S.Ct. 612 (“Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions.”). Also significant is the fact that New York City voters in 1998 passed a referendum altering the New York City Charter to “require[e] disclosure and regulation of contributions by those doing business with the City of New York.” LaRue Deck, Ex. B, Charter Revision Comm’n’s Proposal on Campaign Fin. Reform. The Supreme Court has instructed that such votes may properly be taken as evidence of a perception of corruption that legislatures may legitimately address. See Shrink Missouri, 528 U.S. at 394, 120 S.Ct. 897.
Granted, the record also contains troubling indications that at least some of the proponents of the “doing business” limits may have aimed at curtailing the influence of “doing business” contributors as much as corruption or its appearance. See, e.g., Pines Deck, Ex. F. Report of the New York City Charter Revision Comm’n at 19 (noting that donations by “doing business” contributors “at a minimum ... create the perception that [such] donors have the opportunity and desire to exercise undue influence over elected officials”). The anti-corruption interest pressed by the City in justification of the new contribution limits, however, is borne out in the record. And in these circumstances, the Supreme Court’s precedents regarding contribution limits require the conclusion that New York City’s “doing business” restrictions are closely drawn, despite the lack of a perfect fit between these restrictions and the threat of real or perceived corruption. Indeed, while the Supreme Court has never had occasion to address a campaign finance scheme involving targeted, variable limits as are at issue here, it has consistently counseled that, outside narrow circumstances, see Randall v. Sorrell, 548 U.S. 230, 248-62, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006), deference is owed to legislative determinations regarding campaign contribution restrictions. See, e.g., McConnell, 540 U.S. at 137, 124 S.Ct. 619. Judged by this precedent, New York City’s “doing business” contribution limits fall within—although perhaps barely within—the bounds of the Supreme Court’s contribution limits jurisprudence.
First, those “doing business” within the meaning of the law are held to the stricter contribution limits only while doing business and for a short period thereafter— strongly suggesting that the law is aimed at the particular danger of real or apparent quid pro quo arrangements, rather than mere influence. See McConnell, 540 U.S. at 167, 124 S.Ct. 619 (noting that certain “regulations ... are reasonably tailored, with various temporal ... limitations designed to focus the regulations on the important antieorruption interests to be served”). The Supreme Court has said, moreover, that contribution limits, as opposed to bans, “involve[ ] little direct restraint on [a contributor’s] political communication, for [they] permitf] the symbolic expression of support evidenced by a *209 contribution” and do not otherwise “infringe the contributor’s freedom to discuss candidates and issues.” Buckley, 424 U.S. at 21, 96 S.Ct. 612.[10] While it seems to me an open question whether the City could not achieve its anticorruption goals with less severe restrictions on “doing business” contributors, moreover, the Supreme Court has instructed that courts have no “scalpel to probe” whether a legislative body has selected the precisely optimal balance of free speech and security against corruption. Id. at 30, 96 S.Ct. 612. Cf. FEC v. Nat’l Right to Work Comm., 459 U.S. 197, 210, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (“Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared.”). As to the non-matching restriction placed upon contributions made by the family members or work associates of individuals engaged in lobbying, the majority properly cites to record evidence of circumvention. See Maj. Op. at 194 n. 20. And finally, while I continue to be troubled that the limits apply even as to campaigns for offices in which the officeholder may have no direct authority with regard to the particular business relationship at issue, this feature of the “doing business” restrictions is not unique to the CFA. See 2 U.S.C. § 441c. In any event, appellants have waived this argument by including it only in their reply brief. See Norton v. Sam’s Club, 145 F.3d 114, 117 (2d Cir. 1998).
Despite some disagreement with the majority in terms of the analysis here, I share much common ground with the majority opinion. I agree that the ban on contributions by LLCs, LLPs, and partnerships must be upheld pursuant to FEC v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, which the Supreme Court declined to overrule in Citizens United. More fundamentally, I agree that individual citizens, not their government, should determine who may speak and to whose speech others will listen. See Maj. Op. at 182-83. The Supreme Court has recognized that “[[leveling electoral opportunities [by restricting political speech] means making and implementing judgments about which [candidates’] strengths should be permitted to contribute to the outcome of an election.” Davis, 554 U.S. at 742, 128 S.Ct. 2759. The First Amendment, however, “[premised on mistrust of governmental power ... stands against attempts to disfavor certain subjects or viewpoints,” as well as to draw distinctions among speakers. Citizens United, 130 S.Ct. at 898. This is why “the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.” Buckley, 424 U.S. at 48-49, 96 S.Ct. 612. While I disagree with the majority’s analysis in the respects noted here, neither the majority opinion nor this concurrence casts doubt on the paramount importance of upholding the freedom of individuals to speak as they wish about the political life of the nation or of their communities. It is in the knowledge of this fundamental agreement that I respectfully concur as to Parts I, II and III.A, and concur in the judgment as to Part III.B-E.

. The majority relies principally on the Supreme Court's decision in FEC v. Beaumont, 539 U.S. 146, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003), to uphold the City’s ban on political contributions by partnerships, LLPs, and LLCs. To the extent it also relies on its conclusion regarding undue influence in reaching this determination, however, I similarly disagree.

. The relevant provision phrases the limits as ceilings on the amount each candidate may accept from a single contributor. N.Y.C. Admin. Code § 3-703(l)(i). The distinction is not material here.

. The intricacies of the full statutory definition of "doing business” are not relevant here. Generally speaking, however, "doing business” includes any relationship with the City or its affiliated agencies involving: (1) contracts valued at $100,000 or more (except for emergency contracts or contracts procured through competitive bidding), N.Y.C. Admin. Code §§ 3-702(18)(a)(i), 3-703(l-a), 6-116.2(i)(3)(a); (2) the acquisition or disposition of real property, id. § 3-702(18)(a)(ii); (3) applications for approval for specified transactions involving office space, land-use plans, or zoning changes, id. § 3-702(18)(a)(iii); (4) certain concessions and franchises greater than or equal to $100,000, id. § 3-702(18)(a)(iv); (5) grants greater than or equal to $100,000, id. § 3-702(18)(a)(v); (6) economic development agreements, id. § 3-702(18)(a)(vi); and (7) contracts for investment of pension funds, id. § 3-702(18)(a)(vii). The “doing business” limits apply to “any chief executive officer, chief financial officer and/or chief operating officer of [an entity that has business dealings with the City or an affiliated agency] or persons serving in an equivalent capacity, any person employed in a senior managerial capacity regarding such entity, or any person with an interest in such entity which exceeds ten percent of the entity.” Id. § 3-702(20); see also id. § 3-703(l~a). Generally speaking, an individual is considered to be “doing business” with the City at the time he or she has actual or pending dealings with the City until a specified period after the termination of dealings. N.Y.C. Admin. Code § 3—702(18)(b).

. These activities involve zoning requests pursuant to N.Y.C. Charter §§ 197-c(a)(3) and 201. See N.Y.C. Admin. Code §§ 3-702(18)(d), 3-702(20).

. Contributions from a lobbyist’s spouse, domestic partner, and unemancipated children are also deemed ineligible for matching. Id. § 3-702(16). If the lobbyist is an organization, any officer or employee who engages in lobbying or works for a division of the organization that engages in lobbying, as well as his or her spouse or domestic partner and unemancipated children, are excluded from the matching program. Id.

. Thus, contrary to the majority's contention, see Maj. Op. at 186 n. 13, the Court’s conclusion in Citizens United cannot be confined to the context of expenditure limits, even though Citizens United itself involved such limits, see 130 S.Ct. at 908. Indeed, Buckley's very determination that preventing quid pro quo corruption and its appearance (but not real or perceived influence) may justify trenching on First Amendment freedoms took place in the contribution, not expenditure, context. See Buckley, 424 U.S. at 26-27, 96 S.Ct. 612; see also Citizens United, 130 S.Ct. at 908 ("In Buckley, the Court found this interest [in preventing corruption and its appearance] ‘sufficiently important’ to allow limits on contributions but did not extend that reasoning to expenditure limits.”).

. For instance, the owner of a small apartment complex with an application pursuant to N.Y.C. Charter § 197-c pending before one of New York City’s fifty-nine community boards is tightly restricted in the amount she may contribute to a candidate running for comptroller, even though the comptroller plays no *207 role in the approval process outlined in section 197-c. See Karnovsky Decl. ¶¶ 8-27.

. In fact, the Charter Revision Commission ("CRC”) specifically noted in 1998 that since the City enacted the general limits prohibiting the large contributions of the past, "[gjenerally there is no evidence that ... campaign contributions [by those “doing business” with the City] actually influence the award of a particular contract or passage of a bilk” Pines Deck, Ex. F, Report of the N.Y.C. Charter Revision Comm'n at 19.

. The Pay-to-Play Report reaches this conclusion using a different definition than the one eventually adopted by the City, including only “[f]irms or individuals who are principals of firms who have contracts with the City valued at $100,000 or more[,] and/or ... [Registered lobbyists and lobbyist clients.” Id. at 4. However, the Report’s conclusions still provide evidence in support of the lowered campaign *208 contributions, since many of the contributors captured under the Report’s definition would also fall within the CFA's definition of those "doing business” with the City.

. As the majority opinion notes, appellants make no argument that the "doing business” restrictions prevent candidates from amassing sufficient funds to run effective campaigns, as the unconstitutional Vermont law in Randall, 548 U.S. 230, 126 S.Ct. 2479, did. See id. at 248-62, 126 S.Ct. 2479; see also Green Party, 616 F.3d at 201.